EDWARD P. MORIARITY (SBN: 5622)
BRADLEY L. BOOKE (SBN: 9984)
SHANDOR S. BADARUDDIN (SBN: 9999)
MORIARITY, BADARUDDIN & BOOKE, LLC
124 West Pine Street
Missoula, MT 59802-4222
Telephone:     (406) 728-6868
ed@mbblawfirm.com
brad@mbblawfirm.com
shandor@mbblawfirm.com

Attorneys for Plaintiffs

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| JEANNE REDD, individually and as Personal Representative of the ESTATE OF DR. JAMES REDD, and JAY REDD, JERICCA REDD, JAVALAN REDD, JAMAICA REDD LYMAN and JASMINE REDD, individually and as heirs of their natural father Dr. James Redd<br><br>            Plaintiffs,<br>      v.<br><br>The UNITED STATES OF AMERICA, through its federal agencies: Federal Bureau of Investigation; Department of Justice; and the Bureau of Land Management; and DOES 1-10.<br><br>            Defendants. | **COMPLAINT**<br><br><br>Civil No.:<br><br><br><u>Judge</u> |

COME NOW the Plaintiffs, by and through their undersigned attorneys, and hereby allege against the

Defendant as follows:

….

….

## I.  PARTIES

1.  Plaintiffs are Jeanne Hunt Redd, individually; Jeanne Hunt Redd, in her capacity as Personal Representative of the Estate of her husband Dr. James Redd, and Jay Demar Redd, Javalan Redd, Jericca Redd, Jamaica Redd Lyman, and Jasmine Presley Redd, individually and as heirs of their natural father, Dr. James Redd.

2.  At all times mentioned herein, Plaintiffs Jeanne Redd and Jericca Redd were residents of San Juan County, Utah.

3.   At all times mentioned herein, Plaintiffs Jamaica Redd Lyman and Jasmine Redd were residents of Utah County, Utah.

4.  At all times mentioned herein, Plaintiff Jay Redd was a resident of Washington County, Utah.

5.  At all times mentioned herein, Plaintiff Javalan Redd was a resident of Iron County, Utah,

6.  At all times mentioned herein, decedent Dr. James Redd was a resident of San Juan County, Utah, and the husband of Jeanne Redd and the father of Jay Redd, Javalan Redd, Jericca Redd, Jamaica Redd Lyman, and Jasmine Redd.

7.  Defendant is the United States of America, a sovereign entity, through its federal agencies Federal Bureau of Investigation ("FBI"), Department of Justice ("DOJ"), and Bureau of Land Management ("BLM").

8.  Defendant Does 1-10 are the individuals, public entities, private entities and other State and Federal agencies whose acts and omissions caused or contributed to the death of decedent and damages suffered by Plaintiffs as described herein.  Plaintiffs do not currently know the true identities of these Doe Defendants, but these names will be added by way of substitution when ascertained.

## II. JURISDICTION AND VENUE

9.  Federal jurisdiction exists pursuant to 28 USC § 1346(b), via causes of action alleged under 28 U.S.C.A. §§ 2671 *et seq* for monetary damages for wrongful death, survivorship, malicious prosecution, false imprisonment, intentional infliction of emotional distress, conversion, trespass to chattel, and replevin due to the negligence or wrongful acts or omissions of employees of the Defendant acting within the scope of their office or employment, under circumstances where Defendant United States of America, if a private person, would be liable in accordance with the law of the place where the acts or omissions occurred.

10. Notices of Claim on behalf of each of the Plaintiffs concerning this matter were timely and properly filed with the FBI, DOJ, and BLM, describing the facts, circumstances and damages alleged herein, all as provided in 28 C.F.R. §14, et seq.; 28 U.S.C.A § 1346; and 28 U.S.C.A. §§ 2671-2680.

11. Defendant's FBI agency and DOJ agency denied the respective Notice of Claims against them by way of a letter dated August 5, 2011, that was received by Plaintiffs' counsel on August 10, 2011, and therefore filing of this Complaint was authorized pursuant to 28 U.S.C. § 2675(a).

12. Defendant's BLM agency denied the respective Notice of Claim by way of letters dated December 5, 2011, that were received by Plaintiffs' counsel on December 7, 2011, and therefore filing of this Complaint is authorized pursuant to 28 U.S.C. § 2675(a).

13. Pursuant to 28 USC §1391(b), proper venue for this cause of action is the United States District Court for the District of Utah, as a substantial part of the events or omissions giving rise to the claim occurred in the State of Utah; and additionally venue is proper pursuant to 28 USC § 1402(b), as the Plaintiffs reside in Utah and the alleged acts occurred in Utah.

### III.  FACTS COMMON TO ALL CLAIMS

**Operation Cerberus Action**

14. In the early morning hours of June 10, 2009, federal agents from the BLM, FBI, and DOJ descended on Blanding, Utah, a small town of 3,000 located in the Four Corners region of the southwest.

15. The officer's were culminating a two and a half year undercover operation christened Operation Cerberus Action (hereafter "Cerberus"), which was described to the news media as the "largest investigation ever into the looting of Native American artifacts on public lands."

16. For the preceding two and a half years, utilizing an informant, Ted Gardiner, who posed as an artifacts collector and dealer, federal agents obtained audio and video recordings of various individuals allegedly selling or offering to sell illegal Indian artifacts to Mr. Gardiner.

17. Gardiner, who had previously been a native artifacts broker, enticed Defendant's agents with assertions that his "significant" market knowledge would expose supposed "kingpins" in the industry i.e., artifact traffickers who moved substantial numbers of illegal items.

18. Defendant's agents also had a preconceived misperception that a large black market existed in the native artifacts trade, and Gardiner leveraged this misperception.

19. Evidence also indicates Defendant's agents sought to defuse the legitimate non-illegal trade of artifacts irrespective of the fact such commerce was lawful.

20. Cumulatively, over the undercover phase of Cerberus, Gardiner paid approximately $335,000 in taxpayer funds for approximately 250 relics.

21. In many cases, given his virtually bottomless supply of cash provided by Defendant's agents, Gardner offered exorbitant sums for artifacts to induce sales from individuals with no propensity to sell or barter items.

22. Defendant trained, directed, and encouraged Gardiner to raise the value he paid for the undercover purchases so Gardiner could use his undercover sales, swaps, and purchases to entrap "customers."

23. Artificially enhancing value of the artifacts also resulted in more serious criminal charges, enhancing misdemeanors to felonies, and thereby justifying the great expense of Cerberus.

24. On information and belief, Defendant's agents relied solely on their informant to ascertain the value of the allegedly illegal artifacts.

25. Gardiner was not a recognized expert in artifact valuation.

26. In fact, Gardiner had developed a reputation in the artifacts market for overvaluing items in sales, ripping off purchasers, and consequently burning bridges with customers.

27. As an informant, Gardiner was biased and incentivized to overvalue items, given the Defendant's and informant's preference to bring felony charges against targets of the undercover operation.

28. Defendant additionally failed throughout the implementation of Cerberus to adequately distinguish between articles found on private land, or articles obtained prior to the Archeological Resources Protection Act, or articles that were from Native American civilizations outside the United States.

29. The aforementioned factors are critical and determinative as to whether artifacts were actually illegal.

30. Gardiner, during the undercover phase of Cerberus, was paid approximately $7,500 per month for his services, resulting in $225,000 to $300,000 in compensation.

31. Based in whole or in part on Mr. Gardiner's undercover evidence, 16 of the total 24 Cerberus arrests made on or about June 10, 2009, occurred in Blanding, Utah.

32. The disproportionate number of Blanding residents reflects the fact that land in the Four Corners area of the United States, particularly surrounding Blanding, is saturated with Native artifacts.

33. Locals commonly come across artifacts while hiking or traveling through the desert surrounding Blanding.

34. Historically, Blanding residents were hired by museums in the first half of the 20th century to collect artifacts.

35. Historically, many Blanding residents have a few if not numerous artifacts in their possession, often acquired as family heirlooms from previous generations when federal laws did not prohibit native artifact collection.

**The June 10, 2009 Raid**

36. Early on the morning of June 10, 2009, Dr. Redd was returning home from an errand in town and completion of work at his clinic in Blanding.

37. At that time, he had been a community physician in Blanding for over 30 years, serving as the sole doctor during a significant portion of this time.  Consequently, he was well-known in the community.

38. He taught gospel doctrine on Sunday in his church, which most Blanding residents attended. The Sunday immediately prior to June 10, 2009, residents recall a lesson delivered by Dr. Redd in which he preached of the sanctity of life and how good it was to be alive.

39. By the time Dr. Redd arrived at home on June 10, 2009, unbeknownst to him, Defendant's agents had already inundated the Redd's residence at 6:40 a.m.

40. As Dr. Redd drove up his driveway at approximately 6:55 a.m., paramilitary federal agents from the aforementioned Defendant agencies charged his vehicle and pulled him out at gunpoint in front of his garage.

41. These agents handcuffed Dr. Redd, took him into custody, and thereafter interrogated him for four hours alone in his garage.  Meanwhile agents searched and ransacked his home for approximately eleven and a half hours.

42. The agents called Dr. Redd a liar when he professed his innocence and ignorance of any illegal activity, and taunted him that a felony offense would result in the revocation of his medical license.

43. Meanwhile, Defendant's agents, cognizant of the effect their actions were having on the Redd family, inquired of Mrs. Redd as to whether she was feeling suicidal.

44. Mrs. Redd was handcuffed and in custody in the main portion of the home.

45. Jericca Redd, who was at her parent's home, was also held in custody by Defendant's agents.

46. As to Dr. Redd, Defendant alleged as asserted in the indictment purportedly justifying the search warrant, that he and Jeanne Redd had traded "an effigy bird pendant" with Gardiner in exchange for items that were lawful to possess.

47. Defendant's agents alleged this trade occurred in March of 2008.

48. The origin of the effigy bird pendant, and its authenticity, are uncertain but on information and belief it came from private land. Consequently, it is a mystery if the item was actually illegal, which it would not be if found on private land or acquired from public or tribal land before implementation of the 1979 Archeological Resources Protection Act (ARPA).

49. Additionally, it is also uncertain whether "the effigy bird pendant" ever existed in the first place, or whether any trade or exchange occurred in March 2008.

50. Defendant's agents failed to ever obtain an "effigy bird pendant" identified as the same pendant provided to the Redds via Gardiner's trade of March 2008.

51. Defendant also failed to obtain or ever come forward with the legal items allegedly exchanged by Jeanne Redd to Gardiner for the pendant.

52. Despite the significant uncertainty underlying the "effigy bird pendant," Defendant nonetheless asserted via indictment that the item was worth more than $1,000, thus triggering the applicable felony threshold under pertinent federal laws.

53. Meanwhile, on June 10, 2009, Defendant's agents openly taunted Dr. Redd that this felony charge would result in the revocation of his medical license – a considerable threat given the practice of medicine constituted his livelihood and primary source of income.

54. During the nearly 12-hour long raid at the Redd's residence, there were approximately 80 agents in the home at any one point in time, with approximately 140 different agents despoiling their home during the course of the day.

55. The Government filled the Redd's home with as many agents as possible, and stationed additional agents outdoors because they could not fit inside.

56. At one point, Blanding residents counted 18 federal agent vehicles outside the Redd's home.

57. Defendant's agents devoted an inordinate and disconcerting portion of their search of Redd's home attempting to find the "effigy bird pendant."

58. Despite this disproportionate focus on the pendant, Defendant's agents failed to find the pendant during the eleven and a half hours they spent searching the residence.

59. Defendant's agents again failed to locate the pendant in a subsequent July 7, 2009, evidentiary seizure procedure at the Redd's residence.

60. During this July 7th seizure procedure, Defendant's agents utilized rental trucks to haul away the Redd's entire native artifacts collection, a significant portion of which was a Meso-American collection that federal Indian artifacts laws would clearly have no applicability to.

## Dr. Redd & Other's Deaths

61. The day following the raid, on June 11, 2009, overwhelmed by the federal agents overpowering and egregious behavior, with his livelihood and standing in the community unjustly assaulted, Dr. Redd walked out on the patio of his home, looked East to Colorado and recorded his thoughts to his wife and five children, telling them how much he loved them.

62. Dr. Redd reflected on the attributes that made each of them unique and positive individuals. He also recalled his life growing up in Blanding.

63. Dr. Redd repeatedly noted the impact of the misguided federal charges against his family and himself, and referred to the federal authorities' unchecked ability to invade his family and financial affairs.

64. Thereafter, Dr. Redd rigged a garden hose from the exhaust of his jeep to the interior of his vehicle, started the engine, and asphyxiated himself.

65. Sadly, but not surprisingly, Dr. Redd's suicide was only one of three triggered by outrageous, inhumane, and unjust acts by the Defendant's agents in the course of Cerberus.

66. On June 19, 2009, a week and a half after the initial arrests, Steven Shrader of Santa Fe, New Mexico, also accused of "looting artifacts," died of two self-inflicted gunshot wounds.

67. Most tellingly, on March 1, 2010, Ted Gardiner, the sole federal informant in Cerberus, realizing that he had played a key role in "killing two people," as noted by one of his Alcoholics Anonymous friends, took his life with a handgun.

68. Mr. Gardiner had a history of substance abuse and mental health problems, of which Defendant's agents were aware.

**The Aftermath of the Operation Cerberus Raids**

69. On the evening of the raid, witness(es) present at Defendant's law enforcement facilities in Montecello observed Defendant's agents returning from the raid hooting and hollering like they had won a football game.

70. In response to Defendant's extreme and outrageous behavior, the Utah legislature passed House Bill 146, which became Utah Code § 53-13-106.5 (2010), wherein restrictions were placed on federal law enforcement agents acting on behalf of land management agencies.

71. Also in response to the Defendant's extreme and outrageous behavior Utah's two United States Senators personally wrote United States Attorney Eric Holder requesting an investigation into the excessive use of force that day.

72. Defendant failed to implement such an investigation.

73. Additionally, in response to the Defendant's extreme and outrageous behavior, on June 17, 2009, during a United States Senate Judiciary Committee Meeting focused on Justice

Department oversight, at which Attorney General Eric Holder was present, Utah's Senator Hatch informed Mr. Holder of what the Defendant already knew and had known prior to June 10, 2009: that Dr. Redd was an outstanding and critical member of the community, a decent and honorable man whom given the unnecessary and brutal actions by federal agents was overwhelmed and overwrought, and thus took his life despite being a strong person.

74. Senator Hatch also questioned supervisory officials at both the Department of Justice and Department of Interior, and characterized Interior Secretary Salazar and Deputy Attorney General David Ogden's press conference at which they announced the alleged glowing success of Cerberus, as the biggest "dog and pony show" he had seen in his 33 years as a Senator.

75. In the aftermath of Cerberus, more than two years after the initial arrests were made, none of the criminal defendants has served jail time, as all have pled guilty to reduced charges and only served probation.

76. Tellingly, no illegal artifacts "kingpins" were ever discovered by the Defendant or a large black market revealed despite the enormous cost and scope of Cerberus.

**Defendant's Illegal Personal Property Seizure & Retention**

77. During the course of the raid on June 10, 2009, and a subsequent evidentiary seizure on July 7, 2009, the Defendant confiscated substantial personal property of the Plaintiffs.

78. Although Plaintiffs do not presently seek the return of property listed on federal forfeiture documents, as more specifically described in United States District Court Case No. 2:09CR044-CW, numerous other personal items were converted, retained, and possibly destroyed by the Defendant.

79. On May 27, 2011, Plaintiffs filed a Bivens Action in the United States District Court, District of Utah, against individual federal actors involved in Operation Cerberus, specifically agents who raided Plaintiffs' home.  Subsequent to the concretized threat of legal action, Defendant returned one box of items composed primarily of banking records, plus a telephone of the Plaintiffs' and three digital cameras.

80. Defendant's agents still retain personal journals/diaries, check books, additional financial documents, family photographs, birth certificates, social security cards, and similar items of a personal nature that belong to the Plaintiffs.

81. Defendant's agents possess these items, have admitted possession, and continue to retain these items despite numerous requests by the Plaintiffs to return these items.

82. Defendant's lead BLM special agent in charge of Cerberus, in response to the Plaintiffs' personal item return requests, made highly inappropriate remarks—stating that in order to receive their father/husband's personal journals, "every last shard of pottery around their home would have to be picked up."

83. Defendant's lead BLM special agent in charge of Cerberus, has also inappropriately stated to the Plaintiffs that their father/husband "took one for the team."

84. Defendant's lead BLM special agent in charge of Cerberus, has also engaged in additional highly inappropriate acts towards the Plaintiffs, as set forth below in the Fourth Claim for Relief, Intentional Infliction of Emotional Distress.

### IV.  FIRST CLAIM FOR RELIEF:
### NEGLIGENCE

85. Plaintiffs reallege the allegations of the paragraphs above the same as fully set forth herein.

86. At all times relevant to this action, Defendant's agents were federal employees acting within the scope of their employment either as agents of the FBI under the U.S. Department of Justice or agents of the BLM under the Department of the Interior.

87. Defendant's agents had a duty to exercise its undercover operations, its arrest operations, and seizure operations with reasonable care.

88. In the course of Defendant's investigation, Defendant had a duty to properly identify the origin of artifacts in order to legitimately allege criminal conduct by potential criminal defendants.

89. In the course of Defendant's investigation, Defendant had a duty to objectively value artifact prices to ensure that alleged charges, particularly felony charges, were properly categorized as such and legitimately alleged.

90. In the course of Defendant's investigation, Defendant had a duty to obtain, track, and retain the evidence that would be used to substantiate charges against target individuals.

91. In the course of Defendant's arrest operations, Defendant had a duty to utilize force commensurate with the threat presented by arrest targets.

92. In the course of Defendant's arrest operations, Defendant had a duty to refrain from making inappropriate threats to arrestees.

93. In the course of Defendant's seizure operations, Defendant had a duty to seize relevant items to the investigation.

94. In the course of Defendant's seizure operations, Defendant had a duty to follow established administrative seizure procedures and return items that were not forfeited.

95. Defendant's agents breached each of these duties owed the Plaintiffs, as alleged in the aforementioned facts by failing to adequately conduct the investigation and substantiation of

charges specific to Dr. Redd; by failing to affect the arrest of Dr. Redd with objectively reasonable force; by seizing personal property that was irrelevant to alleged charges, and failing to return personal property not subject to forfeiture.

96. As a direct and proximate cause of the acts and omissions set forth in herein, Plaintiffs suffered damages as more particularly described below.

### V.  SECOND CLAIM FOR RELIEF:
### ABUSE OF PROCESS, MALICIOUS PROSECUTION, FALSE ARREST & IMPRISONMENT

97. Plaintiffs reallege the allegations of the paragraphs above the same as fully set forth herein.

98. At all times relevant to this action, Defendant's agents were federal employees acting within the scope of their employment either as agents of the FBI under the U.S. Department of Justice or agents of the BLM under the Department of the Interior.

99. Dr. James D. Redd was arrested on June 10, 2009, based upon an indictment that was issued on May 29, 2009, and placed under seal.

100. The Indictment only had one count against Dr. Redd, Count 4, which reads: "On or about March 27, 2008 in the Central Division of the District of Utah, JEANNE H. REDD and JAMES D. REDD, defendants herein, did receive, conceal, and retain property belonging to an Indian tribal organization, with a value of more than $1,000 to wit: an effigy bird pendant, knowing such property to have been embezzled, stolen or converted, and did aid and abet therein, all in violation of 18 U.S.C. § 1163 and 2."

101. There was no evidence Dr. Redd possessed, actually or constructively, the item that was the subject of Count 4. There was no evidence that Dr. Redd knew that the item that was the

subject of Count 4 was in his home. In fact, no agent documented that an "effigy bird pendant" was found in Dr. Redd's home, or that it existed at all.

102. Regardless of whether an "effigy bird pendant" existed at all, or whether it was in the Redds' home, there was no evidence that the pendant was worth more than $1,000.

103. The representation of the false value in the indictment was a deliberate and reckless misrepresentation of value provided under oath by Defendant's agents.

104. Defendant confabulated the value with the aid and assistance of paid informant Ted Gardiner, for the deliberate, reckless, and untruthful purpose of having Count 4 of the May 29, 2009, indictment allege a felony.

105. Additionally, the origins of the pendant, and whether it was technically illegal and belonged to a tribal entity as alleged, was unknown and never fully substantiated.

106. Despite insufficient probable cause, Defendant's agents willfully and wantonly, with intent to harm, misrepresented the severity of the alleged crime against Dr. Redd and physically and mentally harassed him in an attempt to get an admission to a crime they knew, or should have known, Dr. Redd did not commit.

107. Defendant's agents dedicated a significant portion of their eleven and a half hour search to locating the pendant they alleged Dr Redd illegally obtained. However, given that the Defendant did not even have a proper identification of said item, failure to find the pendant was assured.

108. Defendant's agents, in lacking a viable description of the pendant, could not accurately present to the grand jury an honest and true value for the pendant.

109. Defendant's agents, in lacking verified information on the origins of the pendant, could not legitimately present to the grand jury that the pendant was in fact illegal.

110. Additionally, Dr. Redd was a primary target of Defendant's in this case due to his status in the Mormon community and his profession, which all members of the community – including Native Americans – recognized and respected.

111. Further malicious and unjustified reasons Defendant's agents targeted Dr. Redd include but are not limited to:

    a. Defendants' intent for Cerberus to change a culture in which many individuals collected with pride, respect, and honor, the Native artifacts – and did so legally;

    b. Defendant's agent's impetus to infuse excitement into the mundane normality of their everyday land management law enforcement duties;

    c. Retaliation against Dr. Redd for a perceived slight after Dr. Redd was involved in a similar incident in 1995. That year, Defendant's agents assisted in bringing a similar Native artifacts state-based charge against Dr. Redd. The Utah Court of Appeals dismissed the charge for insufficient evidence. Upon a second prosecution, the charges were dismissed again and Jeanne Redd opted to concede and pay a fine in lieu of protracted prosecution, but Dr. Redd was never deemed criminally liable;

    d. Defendant's agents sought to make a spectacle in the arrest of Dr. Redd on June 10, 2009, detaining him with an ulterior motive to embarrass, intimidate, humiliate, and make an example of Dr. Redd to community members;

    e. Defendant's agents sought to target Dr. Redd as a leading Mormon in the community, with an ulterior motive to target the Mormon community in general; and

      f.   Prove to the Blanding community and Mormons that Defendant's agents could use excessive and unreasonable force and get away with it.

112.  In summary, Dr. Redd was arrested based on an indictment which on its face was defective and unsupported by probable cause:

      a.   Defendants alleged the date of the crime as March 27, 2008, an impossible date under the circumstances as an effigy bird pendant worth $1,000 was never traded on this date;

      b.   Defendants' pendant valuation cannot be proven and the $1,000 valuation was a deliberate and reckless misrepresentation by the Defendant in the indictment regarding a material element of the crime with which Dr. Redd was charged;

      c.   There is no evidence that Dr. Redd received, concealed, or retained an "effigy bird pendant" worth $1,000; and

      d.   There was no substantiated or credible evidence the "effigy bird pendant" was in fact tribal property or that it was illegal.

## VI.  THIRD CLAIM FOR RELIEF
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

113.  Plaintiffs reallege all allegations of the paragraphs above the same as fully set forth herein.

114.  At all times relevant to this action, Defendant's Agents were federal employees acting within the scope of their employment either as agents of the FBI under the U.S. Department of Justice or agents of the BLM under the Department of the Interior.

115.  Defendant's agents intentionally and/or recklessly engaged in a pattern of extreme and outrageous conduct towards Dr. Redd that caused Dr. Redd to suffer severe emotional distress.

116.  Defendant's agent's utilization of excessive force on Dr. Redd; the inclusion of Dr. Redd in the Indictment without sufficient probable cause; and most disconcertingly, threatening that

Dr. Redd would lose his medical license based on Defendant's trumped up felony charges, were all acts conducted by the Defendant with the intent to cause emotional distress.

117. Defendant's agents also intentionally and/or recklessly engaged in a pattern of extreme and outrageous conduct towards Jeanne and Jerrica Redd that caused Jeanne and Jerrica to suffer severe emotional distress.

118. Defendant's agent's direct statements to Jerricca and Jeanne that Dr. Redd "took one for the team"; that the Redds could not reacquire their husband/father's personal journals until "every last shard of pottery" was picked up around their house; and additional inflammatory statements by Defendant's agents, were deliberate acts conducted by the Defendant with the intent to cause emotional distress to the Plaintiffs.

119. Defendant's agents also, during a post raid meeting with the Plaintiffs, during which a crumpled up picture of their father/husband lay on the floor in the office the meeting was conducted in, refused to remove the crumpled picture of Dr. Redd – despite Plaintiffs requests to do so.

120. Meanwhile, pictures of other targeted defendants in Cerberus remained on the wall above Dr. Redd's crumpled picture on the floor.

121. Defendant's agents' actions with Dr. Redd's crumpled picture were deliberate and conducted with the intent to cause emotional distress to the Plaintiffs.

122. The aforementioned actions of Defendant's agents were extreme and outrageous and were not performed in good faith.

123. Defendant's agent's extreme and outrageous conduct caused Dr. Redd as well as Jeanne and Jerrica Redd to suffer severe mental and emotional anguish and suffering, and entail injuries for which Plaintiffs seek monetary relief, as more particularly described below.

## VII.  FOURTH CLAIM FOR RELIEF:
### WRONGFUL DEATH

124. Plaintiffs reallege all allegations of the paragraphs above the same as fully set forth herein.

125. This claim for relief is brought by Plaintiffs Jeanne Redd, Jay Redd, Javalan Redd, Jericca Redd, Jamaica Redd Lyman, and Jasmine Redd to recover against the Defendant for the wrongful death of Dr. James Redd.

126. At all times relevant to this action, Defendant's agents were federal employees acting within the scope of their employment either as agents of the FBI under the U.S. Department of Justice or agents of the BLM under the Department of the Interior.

127. Utah law provides a cause of action benefitting the heirs of a decedent when his death is caused by the wrongful act or negligence of another, Utah Code Annotated 78B-3-106.

128. Dr. Redd's death was caused, in whole or part, by the conduct of the Defendant's agents.

129. As alleged in the aforementioned facts, Defendant's agents, officers, and employees utilized excessive force in the arrest, manhandling, interrogation, threats, and inappropriate grilling of Dr. Redd.

130. Defendant's agents, officers, and employees, numbering over 100 strong, held no reasonable fear of death or serious bodily harm from Dr. Redd, who at all pertinent

times was unarmed, compliant with the Defendant's requests, and clearly a non-violent citizen.

131. Defendant's agents knew their excessive force could foreseeably lead to a suicide.

132. Despite such, Defendant's failed to exercise objectively reasonable force.

133. Dr. Redd's untimely death would not have occurred but for the malicious acts of federal agents who aggressively manhandled Dr. Redd, unnecessarily held him in custody, and – most critically – verbally threatened and assaulted him. The federal agents repeatedly stated his sole means of livelihood to provide for his family was lost.

134. Defendant's agents were negligent for the decedent's death.

135. Monetary damages and other damages have resulted to the Plaintiffs from Dr. Redd's death, as more particularly described below.

## VIII.  FIFTH CLAIM FOR RELIEF:
## CONVERSION, TRESPASS TO CHATTEL & REPLEVIN

136. Plaintiffs reallege the allegations of the paragraphs above the same as fully set forth herein.

137. Defendant's agents took various items on June 10, 2009, and July 7, 2009.  Items that were forfeited pursuant to law in United States District Court Case No. 2:09CR044-CW are not included or sought in this specific claim for relief.

138. At all times relevant to this action, Defendant's agents were federal employees acting within the scope of their employment either as agents of the FBI under the U.S. Department of Justice or agents of the BLM under the Department of the Interior.

139. Defendants took numerous items of personal value that were not evidence of a crime, nor thought to be evidence of a crime. These items include journals/diaries, checkbooks, financial

documents, family photographs, birth certificates, social security cards, and similar items of a personal nature.

140. These items were not included in forfeiture proceedings.

141. Defendant's actions have permanently deprived the Plaintiffs' of these items of personal property.

142. Defendants' failure, refusal and neglect to return all of the Plaintiffs' personal property not subject to forfeiture constitutes conversion.

143. As a result of this conversion, Plaintiffs have sustained damages including but not limited to deprivation of property, replacement costs for converted items, and compensatory damages for loss of irreplaceable items of sentimental value.

## IX.  SIXTH CLAIM FOR RELIEF:
### SURVIVAL ACTION

144. Plaintiffs reallege the allegations of the paragraphs above the same as fully set forth herein.

145. This survival action claim is brought on behalf of the Estate of James Redd.

146. At all times relevant to this action, Defendant's agents were federal employees acting within the scope of their employment either as agents of the FBI under the U.S. Department of Justice or agents of the BLM under the Department of the Interior.

147. Utah law provides a cause of action benefitting the estate of a decedent for special and general damages when his death is caused by the wrongful act or negligence of another, Utah Code Annotated 78B-3-107.

148. As previously alleged, Defendant's agents engaged in acts or omissions that harmed Dr. Redd with respect to negligence, abuse of process, malicious prosecution, false arrest and

imprisonment, intentional infliction of emotional distress, and conversion of Dr. Redd's personal property.

149. Plaintiffs seek recovery, on behalf of Dr. Redd's Estate, against the Defendant pursuant to Utah's survival action statute for damages sustained due to the aforementioned acts.

## X.  DAMAGES: GENERAL & SPECIAL

150. As a direct and proximate cause and result of the aforementioned acts and omissions of the Defendant, Plaintiffs were injured and Plaintiffs have incurred the following damages:

   a.   The loss of care, comfort, and society of the father/husband, Dr. James Redd;

   b.   Burial and funeral expenses for Dr. James Redd, at a minimum $24,800;

   c.   Past and future emotional pain and suffering;

   d.   Past and future loss of enjoyment of life;

   e.   Loss of earnings and earnings capacity;

   f.   Severe emotional distress;

   g.   Deprivation and use of personal property;

   h.   Past special damages; and

   i.   Past and future general damages.

WHEREFORE, Plaintiffs pray that the Court render judgment and enter an order as follows:

- Judgment against Defendant for general damages in an amount consistent with the allegations set forth herein and to be proven at trial;

- Judgment against the Defendant, for special damages in an amount consistent with the allegations set forth herein and to be proven at trial;

- Pre and post judgment interest;

- Costs of suit; and

- Such other and further relief as the Court deems just and equitable.


RESPECTFULLY submitted this 14th of December, 2011.




   /s/ Edward P. Moriarity        
Edward P. Moriarity (SBN: 5622)
MORIARITY, BADARUDDIN & BOOKE, LLC
124 West Pine Street
Missoula, MT 59802-4222
Telephone:        (406) 728-6868

Attorneys for Plaintiffs