IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ESTATE OF JAMES D. REDD, M.D., et. al, <br><br> Plaintiffs, <br><br><br><br><br> vs. <br><br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS <br><br><br><br><br> Case No. 2:11-CV-1162 TS |

This matter is before the Court on Defendant's Motion to Dismiss. For the reasons set forth more fully below, the Court will grant in part and deny in part.

## I. BACKGROUND

The following facts are taken from the Complaint and are assumed to be true for purposes of this Motion.

In 2006, FBI and Bureau of Land Management agents ("Defendant's agents") began a joint investigation into the looting of Native American artifacts on public land. The operation, dubbed "Cerberus," culminated in the arrest of several alleged traffickers in stolen artifacts in Blanding, Utah, including Dr. James Redd and his wife Jeanne Redd. Dr. Redd had been a

physician in Blanding for over thirty years, was well known and respected, and was an active participant in his church.  At the time of the raid, he was sixty years old.

To assist in their operation, Defendant's agents hired Ted Gardiner, a Native American artifacts dealer and collector, who was working as an undercover informant.  Gardiner had a reputation for selling artifacts at inflated prices, and had mental health and substance abuse issues of which Defendant's agents was aware.  Gardiner had told Defendant's agents that major "kingpins" of artifact trafficking were operating in Southern Utah, and that he had experience dealing with the individuals.  Gardiner was then directed by Defendant's agents to transact with suspected traffickers.  Based on information provided by Mr. Gardiner, a grand jury indicted the Redds on felony charges of trafficking in stolen artifacts, theft of government property, and theft of tribal property.  The Indictment contained six counts, but only one was against Dr. Redd, charging that both he and Jeanne illegally possessed a "bird effigy pendant."  Arrest warrants were issued for Dr. Redd and Jeanne Redd, as well as a search warrant for their home ("the Redd warrants").

Gardiner had valued the bird effigy pendant at $1,000, which, according to Plaintiffs, provided the basis for issuance of a felony warrant rather than a less serious charge.  Plaintiffs contend that the pendant in fact came from private land and was therefore legal to possess, and that Gardiner's valuation of the pendant was grossly inflated.  Plaintiffs do not clarify how Gardiner actually valued the pendant.  Though the Indictment only accuses the Redds of jointly *possessing* the pendant illegally (whereas it accused Mrs. Redd individually of *exchanging* other illegal items), Plaintiffs' briefing seems to assume that the Redds were accused of giving other

2

illegal artifacts to Gardiner in exchange for the pendant.  Thus it is not clear whether Gardiner based his valuation on the items allegedly exchanged, or merely on his knowledge of artifacts generally.

Defendant's agents arrived at Dr. Redd's home in Blanding, Utah around 6:45 a.m. on June 10, 2009.  Dr. Redd was driving home from an early-morning errand when he saw over 100 officers on his property in "paramilitary gear."  After Dr. Redd parked in his driveway, agents charged at him and pulled him out of his car at gunpoint.  Dr. Redd was then handcuffed and taken into his garage where he was interrogated for four hours.

Defendant's agents searched the Redd's home for twelve hours.  The bird effigy pendant was never discovered.  Officers did, however, take other supposed Native American artifacts belonging to the Redds.  One hundred and forty officers participated in the search over the course of the day.  Many of the items seized by the agents had no relationship to the crimes for which the Redds were indicted, including personal items like journals, as well as artifacts that were Meso-American and therefore not illegal to possess.  Some of the items seized have not been returned to the Redds.

The day after the raid, Dr. Redd committed suicide.  His suicide note mentions the raid and its effect on him.

Plaintiffs now bring a variety of tort claims against the United States under the Federal Tort Claims Act ("FTCA").

## II.  STANDARD OF REVIEW

Defendant has moved to dismiss under both 12(b)(1) and 12(b)(6).  Where jurisdictional questions are intertwined with the merits of the case, the Court must convert a 12(b)(1) motion into one under 12(b)(6), or into a motion for summary judgment.[1]  The Tenth Circuit has held that whether certain exceptions under the FTCA apply to bar suit is such a question.[2]  The Court will therefore consider all allegations under the 12(b)(6) standard.

In considering a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), all well-pleaded factual allegations, as distinguished from conclusory allegations, are accepted as true and viewed in the light most favorable to Plaintiffs as the nonmoving party.[3]  Plaintiffs must provide "enough facts to state a claim to relief that is plausible on its face,"[4] which requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[5]  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[6]  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial,

---

[1]*Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1129 (10th Cir. 1999).

[2]*Id.* at 1229-30.

[3] *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[4] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

[5] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

[6] *Id.* (quoting *Twombly*, 550 U.S. at 557) (alteration in original).

but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[7]  As the Supreme Court stated in *Iqbal*,

> only a complaint that states a plausible claim for relief survives a motion to dismiss.  Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief.[8]

## III.  DISCUSSION

Plaintiffs have alleged (1) negligence, (2) malicious prosecution, (3) abuse of process, (4) false arrest, (5) false imprisonment, (6) intentional infliction of emotional distress, (7) wrongful death, and (8) trespass to chattels, conversion and replevin against the United States under the FTCA.

## A.    THE FTCA

The FTCA partially waives the United States's sovereign immunity from tort liability. Under the act, the United States is liable for certain torts "in the same manner and to the same extent as a private individual under like circumstances."[9]  The waiver is limited, however, by several exceptions.  At issue here are the discretionary function and detention of goods exceptions, which Defendant suggests bar all of Plaintiffs' claims.

---

[7] *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

[8] *Iqbal*, 129 S. Ct. at 1949-50 (alteration in original) (internal quotation marks and citations omitted).

[9] 28 U.S.C. § 2674.

1. DISCRETIONARY FUNCTION EXCEPTION

The FTCA's waiver of sovereign immunity does not apply to

[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.[10]

Application of this exception requires two steps. The first step asks whether the challenged conduct is "discretionary." The Supreme Court has explained:

In examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting employee. This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice. Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect.[11]

If the Court determines that the conduct in question does involve some amount of discretion or judgment, the Court then must determine if the judgment is

of the kind that the discretionary function exception was designed to shield. The basis for the discretionary function exception was Congress' desire to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy.[12]

---

[10]28 U.S.C. § 2680(a).

[11]*Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988) (citations omitted).

[12]*Id.* at 536-37 (internal quotation marks and citations omitted).

Defendant has argued that (1) Plaintiffs have identified no policy that governs the conduct Plaintiffs focus on and (2) that "[d]ecisions concerning whether, when, against whom, and how to enforce compliance with the Archaeological Resources Protection Act, as well as how to deter misconduct in others, necessarily reflect the policy-based judgments of federal officials."[13]  To subject these decisions to review, Defendant suggests, would be to "impermissibly engage in judicial second-guessing" of policy-based determinations.

Defendant characterizes Plaintiffs' claims as based on five categories of government conduct: (1) the identification and valuation of evidence for investigation; (2) the use of an informant in a criminal investigation; (3) the identification of evidence for the grand jury; (4) execution of the search and arrest warrants; and (5) the scope of the seizure and detention of potential evidence.  As a general matter, courts tend to hold that these kinds of government actions are quintessential discretionary conduct.[14]

 Plaintiffs respond by emphasizing that their baseline contention is that some of Defendant's conduct during the Cerberus process violated the Constitution and, as a result, was nondiscretionary.  It is widely accepted that law enforcement officers do not have discretion to

---

[13]Docket No. 20, at 18.

[14]*See, e.g.*, *O'Ferrell v. United States*, 253 F.3d 1257, 1267 (11th Cir. 2001) ("Just how law enforcement agents are to conduct interrogations would appear to be a paradigmatic example of a discretionary function.  The process is one that involves elements of judgment and choice—the central ingredients of discretion."); *Pooler v. United States*, 787 F.2d 868, 871 (3d Cir. 1986) ("Congress did not intend to provide for judicial review of the quality of investigative efforts."); *Mesa v. United States*, 837 F. Supp. 1210, 1213 (S.D. Fla. 1993) ("We hold as a matter of law that the function of determining when and how to execute an arrest warrant is quintessentially a discretionary function, involving choices and judgments that are grounded in policy considerations.").

violate the Constitution.[15]  Accordingly, the Court is required to analyze whether the accused

conduct is unconstitutional in order to determine whether conduct is discretionary.  If the conduct

is discretionary, then the Court does not have subject matter jurisdiction over the claim on which

the conduct is based and must dismiss for lack of jurisdiction.

2.  THE DETENTION OF GOODS EXCEPTION

> [T]he FTCA authorizes claims against the United States, for money damages . . .
> for injury or loss of property . . . caused by the negligent or wrongful act or
> omission of any employee of the Government while acting within the scope of his
> office or employment.  The FTCA exempts from this waiver certain categories of
> claims.  Relevant here is the exception in subsection (c), which provides that §
> 1346(b) shall not apply to [a]ny claim arising in respect of the assessment or
> collection of any tax or customs duty, or the detention of any goods, merchandise,
> or other property by any officer of customs or excise or any other law enforcement
> officer.[16]

Under this provision, to the extent the Court finds that any of Plaintiffs' claims are

predicated on the FBI or BLM's negligent or wrongful handling of the Redd's property, the Court

must dismiss the claim.

With these principles in mind, the Court will consider each of Plaintiffs' claims.

---

[15] *See, e.g.*, *Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001) ("'[F]ederal officials do not possess discretion to violate constitutional rights or federal statutes.'") (quoting *U. S. Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988)); *Pooler*, 787 F.2d at 871 ("[I]f the complaint were that agents of the government in the course of an investigation had violated constitutional rights or federal statutes, the outcome would be different since federal officials do not possess discretion to commit such violations."); *Rich v. United States*, 158 F. Supp. 2d 619, 629 (D. Md. 2001) ("However, Plaintiffs' claims here are based on the entry and search of their home, not the prior investigation.  These acts are the subject of Fourth Amendment limitations . . . and thus can hardly be said to be discretionary.  Accordingly, the Court has subject matter jurisdiction over these claims.").

[16] *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218 (2008) (internal quotation marks and citations omitted).

B.      NEGLIGENCE

Plaintiffs' negligence claims fall into three categories: (1) negligence during the investigation of the Redds; (2) negligence during the execution of the Redd warrants; and (3) negligence in the handling of Dr. Redd's property after it was seized.  This Section addresses the first two categories.  The post-raid negligence claims are analyzed in Section D *infra*.

1. INVESTIGATORY NEGLIGENCE

Plaintiffs' investigatory negligence claims allege that Defendant had and breached a duty to (1) "exercise its undercover operations . . . with reasonable care"; (2) "properly identify the origin of artifacts in order to legitimately allege criminal conduct by potential criminal defendants"; and (3)  "objectively value artifact prices to ensure that alleged charges, particularly felony charges, were properly categorized as such and legitimately alleged."[17]  In other words, Plaintiffs contend that agents negligently selected Gardiner, a person with mental health and substance abuse issues, as an informant and then failed to verify information and/or valuations of artifacts he provided.

"The decision on how to investigate, who to investigate and how to present evidence to the proper authorities are classic examples of discretionary conduct."[18]  Accordingly, the Court finds that the agent's selection of Gardiner, as well as their decision to rely on the information he provided, are protected by the discretionary function.  To the extent that Plaintiffs allege that the

---

[17]Docket No. 2, at 13.

[18]*Crow v. United States*, 634 F. Supp. 1085, 1089 (D. Kan. 1986).

agents' negligence formed the basis for a constitutional violation—i.e. that the Redd warrants were based on contrived information—that argument is discussed below.

2.  NEGLIGENCE DURING THE RAID

Plaintiffs further allege that Defendant's agents had and breached the following duties when executing the Redd warrants: (1) "to utilize force commensurate with the threat presented by arrest targets"; (2) "to refrain from making inappropriate threats to arrestees"; and (3) "to seize relevant items to the investigation."[19]

The Court understands these claims to be that (1) the government used too much force during the raid; (2) the government inappropriately threatened Dr. Redd with the loss of his medical license; and (3) the government inappropriately seized evidence not related to the alleged crimes.

The Court notes that this same conduct by Defendant's agents underlies Plaintiffs' intentional tort claims.  The Court will therefore address whether that conduct was discretionary in its consideration of the intentional torts allegations below.

C.   TORTS AGAINST DR. REDD'S PERSON

Plaintiffs have alleged malicious prosecution, abuse of process, false arrest, false imprisonment, intentional infliction of emotional distress, and wrongful death against Defendant. Each of these claims is founded on some combination of the following allegations: (1) that Defendant's agents trained Gardiner to inflate the value of artifacts he appraised in order to fabricate probable cause for felony violations; (2) that Defendant's agents used excessive force

---

[19]Docket No. 2, at 13.

against Dr. Redd; and (3) that Defendant's agents interrogated Dr. Redd for too long and made

inappropriate statements during the interrogation.  The Court will consider whether this conduct

is protected by the discretionary function exception.

1. GARDINER'S INVOLVEMENT

Plaintiffs make the following allegations with respect to Defendant's agent's interactions

with Gardiner:

> Defendant trained, directed, and encouraged Gardiner to raise the value he paid
> for the undercover purchases so Gardiner could use his undercover sales, swaps,
> and purchases to entrap "customers"; Artificially enhancing value of the artifacts
> also resulted in more serious criminal charges, enhancing misdemeanors to
> felonies, and thereby justifying the great expense of Cerberus; Defendant's agents
> relied solely on their informant to ascertain the value of the allegedly illegal
> artifacts; Gardiner was not a recognized expert in artifact valuation; Gardiner had
> developed a reputation in the artifacts market for overvaluing items in sales,
> ripping off purchasers, and consequently burning bridges with customers; As an
> informant, Gardiner was biased and incentivized to overvalue items, given the
> Defendant's and informant's preference to bring felony charges against targets of
> the undercover operation; Defendant additionally failed throughout the
> implementation of Cerberus to adequately distinguish between articles found on
> private land, or articles obtained prior to the Archeological Resources Protection
> Act, or articles that were from Native American civilizations outside the United
> States.[20]

In *Crow v. United States*,[21] the District Court for the District of Kansas considered

whether the discretionary function exception barred plaintiff's claim that law enforcement

personnel had acted with "reckless and intentional disregard for the truth."[22]  The court held that

"to the extent . . . that plaintiff challenges the planning, preparation and completion of the

---

[20]*Id.* at 5.

[21]634 F. Supp. 1085.

[22]*Id.* at 1087.

investigation, plaintiff's claims are barred" because "[t]he decision on how to investigate, who to investigate and how to present evidence to the proper authorities are classic examples of discretionary conduct."[23]

However, the court went on to state that

Congress never intended to shield the government from liability for an employee's acts in falsifying records or lying to bring about a suspect's criminal prosecution. This type of conduct is certainly not the type of "legislative [or] administrative decision grounded in social, economic, and political policy" that must be protected from "second guessing."[24]

Accordingly, the court held that "to the extent plaintiff claims the postal inspectors falsified their reports and memoranda and gave false testimony so as to bring about plaintiff's prosecution, plaintiff's action is not barred by the discretionary function exception to the Federal Tort Claims Act."[25]

Plaintiffs' attempts to show that Gardiner was a poor choice for informant and that agents failed to further research the origins of the artifacts to make certain they were illicit clearly fall into the "how to investigate" category which *Crow* found was barred by the discretionary function exception.  Persuaded by *Crow*'s reasoning, the Court therefore finds that this conduct was discretionary.

On the other hand, Plaintiffs' allegations that Defendant's agents directed Gardiner to artificially raise the value of artifacts and then relied solely on his valuations, all so that they

---

[23]*Id.* at 1089.

[24]*Id.* at 1090 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)).

[25]*Id.*

could have a basis for seeking a felony indictment, fits into the category of behavior that *Crow* found to be non-discretionary.  Furthermore, though *Crow* did not frame this issue as a constitutional question, the Court would note here that if Defendant's agents deliberately falsified information in order to show probable cause in their warrant application, such conduct would violate the Fourth Amendment and would therefore be nondiscretionary.[26]  Thus, if Plaintiffs' well-pleaded facts show willful dishonesty by Defendant's agents, Plaintiffs may have stated a claim for relief.

 However, the Court finds that Plaintiffs' allegation that Gardiner intentionally overvalued the pendant is implausible, and therefore not well-pleaded.  The Redds were indicted for "receiv[ing], conceal[ing], and retain[ing] property belonging to an Indian tribal organization, with a value of more than $1,000 to wit: an effigy bird pendant, knowing such property to have been embezzled, stolen, or converted."[27]  Jeanne Redd pleaded guilty on this count.  In her

---

[26]*O'Ferrell v. United States*, 968 F. Supp. 1519, 1534-35 (M.D. Ala. 1997), *aff'd*, 253 F.3d 1257 (11th Cir. 2001) ("Although courts routinely hold that how and under what circumstances a law enforcement officer conducts a criminal investigation is a discretionary function, an officer has no discretion to conduct a criminal investigatory search pursuant to a warrant invalidated due to a *Franks* violation where no basis justifying a warrantless search exists, whether or not the officer knew or had reason to know that the warrant was invalid.").

[27]Criminal Case No. 2:09-CR-00044, Docket No. 4, at 2.  "[W]hen considering a motion to dismiss, "'the court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record.'" *Genesee Cnty. Emp's. Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1082, 1122 (D.N.M. 2011) (quoting *Van Woudenberg v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000), *abrogated on other grounds by*, *McGregor v. Gibson*, 248 F.3d 946, 955 (10th Cir. 2001)).

Statement in Advance of Plea, Jeanne Redd acknowledged that the pendant had a value in excess of $1,000.[28]

The Court finds that Jeanne Redd's admission that the pendant was worth $1,000 makes it implausible that Gardiner, at least in this instance, employed a fraudulent method of valuation in declaring that the pendant was worth $1,000.  Jeanne Redd, in entering her plea, was required to convince the judge that she actually committed the crime to which she pleaded guilty.  The Court cannot ignore the reliability of such a statement.  Accordingly, the Court finds Plaintiffs' allegation that Gardiner employed a deliberately inaccurate method of valuation for the bird effigy pendant implausible, and will not accept it as true.

This finding undermines most of Plaintiffs' intentional tort claims.  The malicious prosecution and abuse of process claims rest entirely on the allegation that Defendant's agents unconstitutionally coached Gardiner to falsify his valuations.  Plaintiffs' false arrest and false imprisonment claims are primarily based on the allegation that the Redd warrants were invalid for lack of probable cause.  Finally, Plaintiffs' intentional infliction of emotional distress claim is based in part on the allegation that Defendant's agents decided to indict Dr. Redd even though they lacked probable cause.  Because the Court does not accept Plaintiffs' allegation that probable cause was fabricated, the Court finds that all of the challenged conduct was discretionary.  Therefore, the Court will deny these claims, to the extent they rely on that conduct, for lack of subject matter jurisdiction.

---

[28]*Id.*, Docket No. 31, at 4.

14

2.  EXCESSIVE FORCE

Plaintiffs have also claimed intentional infliction of emotional distress and wrongful death based on the Defendant's agents' alleged use of excessive force against Dr. Redd.  The decision of how to execute an arrest warrant is quintessential discretionary conduct.[29]  However, to the extent the force employed was constitutionally unreasonable, the discretionary function exception does not apply.

Plaintiffs make two distinct excessive force claims.  One focuses on the decision to use the amount of force that was employed, arguing that the dispatch of 100 heavily armed agents amounts to an excessive show of force not reasonable under the circumstances.  The other focuses on the actual conduct of the agents during the raid.

As to the first contention, the Tenth Circuit has held that the decision of what amount of force to use to execute a warrant is governed by the Fourth Amendment, so that if the degree of force decided upon is unreasonable, the Fourth Amendment is violated.[30]  Thus, the Tenth Circuit has reviewed a decision to send in a SWAT team to execute a warrant by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."[31]  The Court will apply this same test to evaluate the amount of force used to execute the Redd warrants.

---

[29]*See, e.g.*, *Mesa*, 837 F. Supp. at 1213 ("We hold as a matter of law that the function of determining when and how to execute an arrest warrant is quintessentially a discretionary function, involving choices and judgments that are grounded in policy considerations.").

[30]*Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1190 (10th Cir. 2001).

[31]*Id.*

Accepting as true Plaintiffs' allegation that 100 plus heavily armed officers were sent to arrest Dr. Redd and search his home, which the Court must, the Court finds that the decision to use that amount of force was unreasonable and therefore nondiscretionary.

Considering the use of a SWAT team to execute an arrest warrant in *Holland ex rel. Overdorff v. Harrington*, the Tenth Circuit has stated that "[t]he decision to deploy a SWAT team to execute a warrant necessarily involves the decision to make an overwhelming show of force—force far greater than that normally applied in police encounters with citizens."[32]   Though *Overdorf* does not state how many SWAT team members were present, it is unlikely that the number approached anything close to the 100 plus officers alleged to have been present at the Redd's home.  The lack of other indicia of danger further supports the Court's conclusion: Dr. Redd was not accused of a violent crime, was not known to be dangerous or living with dangerous people, and nothing suggested that evidence would be destroyed unless a large force was dispatched.

In sum, the overwhelming show of force alleged was a serious intrusion into Dr. Redd's privacy, and it is not clear to the Court that a governmental interest justified its use.  Accordingly, based on the facts alleged in the Complaint, the Court finds that the decision to employ the force used against Dr. Redd was unreasonable, and therefore nondiscretionary.

Though Defendant has argued that Plaintiff's Complaint fails to state a claim for relief in its entirety, Defendant has not provided any argument on that point specific to Plaintiff's claims for intentional infliction of emotional distress or wrongful death.  The Court will therefore not

---

[32]*Holland*, 268 F.3d at 1190.

consider those issues here.  The Court will deny the motion to dismiss as to Plaintiff's intentional infliction of emotional distress and wrongful death claims, to the extent they rely on Defendant's agents' decision to use the amount of force employed against Dr. Redd, on the grounds that the discretionary function exception does not apply.

As to the second basis for Plaintiffs' excessive force claims—the conduct of the agents during the raid—Plaintiffs allege that Dr. Redd returned home from an early morning errand on the day of the raid to find over 100 agents on his property.  "Rather than turning around to flee, Dr. Redd continued down the driveway and parked."[33]  "Despite this reasonable behavior"[34] on Dr. Redd's part, agents pulled him out from his car at gunpoint.  Dr. Redd was thereafter kept in his garage and interrogated for four hours while agents searched his house for evidence.

The Court finds that this force was not excessive.  "The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."[35]

> Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person.[36]

---

[33]Docket No. 21, at 23.

[34]*Id.*

[35]*Graham v. Connor*, 490 U.S. 386, 396 (1989).

[36]*Holland*, 268 F.3d at 1193.

However, it is "not unreasonable for officers to carry weapons or to take control of a situation by displaying their weapons."[37]  Plaintiffs have not alleged that the officers' use of weapons went beyond the initial moment when Dr. Redd was pulled from the car.  The Court thus finds no basis for holding that Defendant's agents used more force than was necessary to "take control of the situation."

Accordingly, the Court finds that the force used by Defendant's agents during the raid was not excessive.  The discretionary function therefore bars Plaintiffs' intentional infliction of emotional distress claim and wrongful death claims to the extent they rely on that conduct.

3.      EXCESSIVE INTERROGATION, THREATS

Finally, Plaintiffs have alleged that Defendant's agents violated the Constitution by interrogating Dr. Redd for too long and by threatening him with the loss of his medical license during the interrogation.  These allegations are made in support of the intentional infliction of emotional distress, false arrest, and false imprisonment claims.

"Just how law enforcement agents are to conduct interrogations would appear to be a paradigmatic example of a discretionary function.  The process is one that involves elements of judgment and choice—the central ingredients of discretion."[38]  Plaintiffs have provided the Court with no authority that suggests that the right of police officers to interrogate a suspect arrested under a warrant is so limited as to make the length of the interrogation here constitutionally

---

[37]*Id.* at 1192.

[38]*O'Ferrell*, 253 F.3d at 1267.

unreasonable.[39]  Accordingly, the Court finds that the length of the detention was discretionary and will dismiss this point for lack of subject matter jurisdiction.

The Court reaches the same conclusion with respect to the agents threatening Dr. Redd with the loss of his medical license.  Even if officers grossly exaggerate the potential consequences of a conviction (which does not appear to be the case here), such an exaggeration is an abuse *of discretion*, and therefore barred by the discretionary function.[40]  Plaintiffs have provided no authority for the proposition that telling a suspect the likely consequences of a conviction for the crime charged is unconstitutional.  The Court therefore finds that the accused conduct is covered by the discretionary function exception.

_____

[39]*United States v. Hambleton*, 185 F.2d 564 (D. Wash. 1949), to which Plaintiffs cite for the proposition that police do not have discretion to use emotionally distressing tactics in an interrogation, does not address whether interrogating for "too long" is a constitutional violation. Furthermore, *Hambleton* implied that a military investigator did not have discretion to "inappropriately grill" a non-suspect civilian—not that a law enforcement officer may not question an arrestee.  Regardless, *Hambleton* was reversed by the Ninth Circuit on the grounds that the intentional infliction of emotional distress alleged by plaintiff relied on conduct that would form the basis for the intentional tort of assault, and that therefore Congress must have intended to forbid a claim for intentional infliction of emotional distress under the intentional tort exception found in subsection (h) of the FTCA (which did not, at that time, allow for intentional torts against law enforcement personnel).  *United States v. Hambleton*, 185 F.2d 564 (9th Cir. 1950) (*Hambleton II*).  Though forty years later in *Sheehan v. United States*, 896 F.2d 1168 (9th Cir. 1990) the Ninth Circuit recognized that *Rayonier Inc. v. United States*, 352 U.S. 315 (1957) overruled *Hambleton II*, the *Sheehan* court did not discuss the discretionary function exception. Rather *Sheehan* simply held that *Hambleton II*'s conclusion that subsection (h) forbids an intentional infliction of emotional distress claim was incorrect.  *Sheehan* therefore does not state that law enforcement officers do not have discretion to use emotionally distressing interrogation practices when questioning an arrestee.

[40]*O'Ferrell*, 253 F.3d at 1267 (denying a claim based on officers allegedly informing arrestees that they "faced the electric chair" if they failed to confess to their crime because how to interrogate is a discretionary function, even though the officers' conduct would be an abuse of that discretion).

D.      TORTS AGAINST PROPERTY

Plaintiffs have also alleged trespass to chattels, replevin, and conversion against Defendant.  Under these claims, Plaintiffs attempt to impose liability on Defendant based on Defendant's agent's seizure and continuing detention of Dr. Redd's property.  Defendant argues that these claims are barred by the detention of goods exception.

The detention of goods exception bars "[a]ny claim arising in respect of the assessment or collection of any tax or customs duty, or the detention of any goods, merchandise, or other property by any officer of customs or excise or any other law enforcement officer."[41]

In *Kosak v. United States*,[42] the Supreme Court found that the detention of goods exception barred a claim against customs officials who damaged goods in their possession.  In so holding, the Court stated that "'any claim arising in respect of' the detention of goods means any claim 'arising out of' the detention of goods, and includes a claim resulting from negligent handling or storage of detained property."[43]  Relying on this case, Defendant argues that Plaintiffs' conversion, trespass to chattels, and replevin claims, which are based on the allegation that the Redd's property was wrongfully taken and retained by Defendant's agents, are barred.

Plaintiffs contend that *Kosak*'s reasoning does not apply here.  Plaintiffs note that *Kosak* defined the objective of the detention of goods exception as "ensuring that 'certain governmental activities' not be disrupted by the threat of damage suits; avoiding exposure of the United States

---

[41]28 U.S.C. § 2680(c).

[42]*Kosak v. United States*, 465 U.S. 848 (1984).

[43]*Id.* at 854.

20

to liability for excessive or fraudulent claims; and not extending the coverage of the Act to suits for which adequate remedies were already available."[44]  Because those objectives would not be met by applying the exception to the FBI/BLM seizure of the Redd's goods, Plaintiffs argue, the Court should not apply it.  In its reply, Defendant suggests that *Ali v. Federal Bureau of Prisons*[45] forecloses this argument.

In *Ali*, plaintiffs had argued that § 2680(c) applied "only to law enforcement officers enforcing customs or excise laws, and thus does not affect the waiver of sovereign immunity for his property claim against officers of the Federal Bureau of Prisons (BOP)."[46]  The Court disagreed, holding that "Section 2680(c) forecloses lawsuits against the United States for the unlawful detention of property by 'any,' not just 'some,' law enforcement officers" and that application of the exception does not "turn of the type of law being enforced."[47]

Plaintiffs' claim is essentially that the detention of goods exception should not apply to FBI/BLM officers because they perform different functions than customs officials.  However, in light of *Ali's* finding that the exception bars suit against all law enforcement officers, no matter what type of law they are enforcing, the Court cannot see how the exception does not apply here, despite any differences of function between Defendant's agents.  Accordingly, the Court will

---

[44]*Id.* at 858.

[45]552 U.S. 214 (2008).

[46]*Id.* at 216.

[47]*Id.* at 228.

dismiss Plaintiffs' conversion, trespass to chattels, and replevin claims for lack of subject matter jurisdiction.

The same analysis is applicable to Plaintiffs' negligence claim based on Defendant's alleged breach of a duty to "seize relevant items to the investigation"[48] during the raid, as well as the alleged breach of a duty to "obtain, track, and retain the evidence that would be used to substantiate charges against individuals" and to "follow established administrative procedures and return items that were not forfeited"[49] after the raid.  Therefore these claims will also be dismissed.

## IV.  CONCLUSION

In light of the foregoing, the Court finds that Plaintiffs' malicious prosecution, abuse of process, false arrest and false imprisonment claims are barred in their entirety by the discretionary function exception.  The Court further finds that Plaintiffs' intentional infliction of emotional distress and wrongful death claims are barred to the extent they rely on the conduct of Defendant's agents during the raid, but are not barred to the extent they rely on the allegation that Defendant's agents dispatched 100 plus heavily armed officers to execute the Redd warrants.  Finally, the Court finds that the detention of goods exception bars Plaintiffs' conversion, trespass to chattels, replevin, and post-raid negligence claims.  It is therefore

ORDERED that Defendant's Motion to Dismiss (Docket No. 19) is GRANTED IN PART AND DENIED IN PART.

---

[48]Docket No. 2, at 13.

[49]*Id.*

DATED   June 26, 2012.

BY THE COURT:

_____
TED STEWART
United States District Judge