IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ESTATE OF JAMES D. REDD, M.D., et al.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br><br>Case No. 2:11-CV-1162 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Defendant's Motion for Summary Judgment. The Court will grant Defendant's Motion for reasons more fully addressed below.

I.  BACKGROUND

This case arises out of the tragic suicide of Dr. James D. Redd the day after federal agents arrested him and his wife for theft of tribal property and trafficking in stolen artifacts. The Estate of Dr. James D. Redd, Jeanne Redd, Jay Redd, Jericca Redd, Javalan Redd, Jamaica Redd Lyman, and Jasmine Redd ("Plaintiffs") brought several tort claims against the United States under the Federal Tort Claims Act ("FTCA"). On the United States' ("Defendant") prior motion to dismiss in 2012 ("Rule 12 Order"), the Court dismissed all of Plaintiffs' claims except for its intentional infliction of emotional distress ("IIED") and wrongful death claims based on the alleged use of excessive force against Dr. Redd.

In their Complaint, Plaintiffs alleged that Defendant dispatched over 100 heavily armed officers to execute the Redd warrants. Accepting as true Plaintiffs' allegations, the Court found that the decision to use that amount of force was potentially unreasonable and therefore

nondiscretionary, falling outside the discretionary function exception of the FTCA. Now at the summary judgment stage, the record paints a different picture and supports the entry of judgment in favor of Defendant.

In 2006, the Federal Bureau of Investigation ("FBI") and the Bureau of Land Management ("BLM") began a joint investigation into the looting of Native American artifacts on public land. The operation, dubbed "Cerberus," culminated in the simultaneous execution of 12 search warrants and 19 arrest warrants in Southern Utah, including the search and arrest warrants for Dr. Redd and his wife at their residence in Blanding, Utah.

At approximately 6:40 a.m. on June 10, 2009, an initial team consisting of about 12 federal agents and one unarmed cultural specialist arrived at the Redd residence. Mrs. Redd and their adult daughter were home, but Dr. Redd was not. Mrs. Redd answered the door and was arrested without incident. At approximately 6:55 a.m., Dr. Redd returned home and was arrested in the driveway without incident and taken to the garage where agents questioned him until 9:30 a.m. Dr. Redd and Mrs. Redd were transported to the BLM office in Monticello at roughly 10:34 a.m. By 10:34 a.m., an additional nine federal personnel had arrived at the Redd residence to assist with the search or observe in a supervisory capacity. In total, 22 federal personnel were present at the Redd home between 6:40 a.m. and 10:34 a.m.

After Dr. Redd was removed from the residence, federal personnel continued to arrive and depart the Redd residence at various times throughout the day.

At approximately 11:55 a.m., a voice message was left on the Redds' answering machine:

"Is anybody there? I know somebody's there. A whole bunch of you. You gonna pick up the phone? All right. I'll be in there in a little bit. Be ready."[1]

---

[1] Docket No. 53 Ex. 10, at 8.

At approximately 1:13 p.m., a second message was left:

"Hey, you guys still too scared to answer the phone? Don't touch anything of mine. Trust me. You don't want to."[2]

In response to those messages, the FBI enlisted the help of four members of an FBI SWAT team who were already present at the residence serving in their primary role as FBI agents assisting with the search. Those four agents switched gears and transformed into a protective role by acquiring long guns from their vehicles and taking up tactical positions at or around the residence to ensure the safety of the federal personnel engaged in the ongoing search and cataloging of evidence. No other SWAT team was assembled or otherwise called to the Redd residence on that day.

Dr. Redd's adult daughter ("Ms. Redd") was present at the Redd residence on the morning of the raid. In her declaration, Ms. Redd recounts seeing five or six law enforcement agents approaching the front door at approximately 6:40 a.m. She was immediately taken to the "Piano Room" of the house after her mother was arrested. Ms. Redd describes "many agents coming and going from the Piano Room and from the house"[3] and that "there were more agents than [she] could count."[4] Ms. Redd was eventually allowed to leave the Piano Room and go outside. From the front porch, Ms. Redd states she saw "6-8 agents in the area immediately in front of the front door."[5]

---

[2] *Id.*

[3] Docket No. 60-1, at 3.

[4] *Id.*

[5] *Id.* at 4.

Ms. Redd describes the initial team of federal agents as having been "heavily armed"[6] and "appeared to be wearing bullet-proof vests or some sort of body armor or flak jacket."[7] They appeared to be "more like military than . . . police officers"[8] and carried what "looked like machine guns."[9]  Ms. Redd claims that from the time she first saw federal agents at approximately 6:40 a.m. until she left the Redd residence at approximately 12:00 p.m., "there appeared to be as many as 50 agents at any one time."[10]  She states that the agents who arrived later throughout the day "were not as heavily armed as the first set of agents were armed."[11]

According to the federal personnel sign-in log, a total of 53 federal personnel, including seven unarmed cultural specialists had visited the Redd residence by the time the operation concluded at approximately 5:36 p.m. on June 10.  Approximately 800 artifacts were inventoried and ultimately seized from the Redd residence.

The day following the raid, Dr. Redd committed suicide.  Plaintiffs bring wrongful death and IIED claims against Defendant under the FTCA.

## II.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[12]  In considering whether a genuine dispute of material fact exists, the Court determines whether a

---

[6] *Id*.
[7] *Id*.
[8] *Id*. at 5.
[9] *Id*.
[10] *Id*. at 6.
[11] *Id*.
[12] Fed. R. Civ. P. 56(a).

reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[13] The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[14]

### III. DISCUSSION

Defendant moves to dismiss Plaintiffs' remaining wrongful death and IIED claims based on the alleged use of excessive force against Dr. Redd under the discretionary function exception of the FTCA. Defendant alternatively argues that under Utah law, Plaintiffs cannot prove proximate causation necessary for Plaintiffs' IIED and wrongful death claims should the Court find that the FTCA governs.

In response, Plaintiffs argue that its claims are not jurisdictionally barred under the discretionary function exception of the FTCA because the decision to "use the amount of force that was used, including the number of armed agents dispatched, and the manner in which they were equipped," amounts to an excessive show of force unreasonable under the circumstances, which makes the conduct unconstitutional and therefore nondiscretionary.[15] Plaintiffs argue that summary judgment should alternatively be denied because Plaintiffs maintain a "survival action" against Defendant, which Plaintiffs argue survived the Court's Rule 12 Order because it was not affirmatively dismissed. Additionally, Plaintiffs argue that their IIED claim should not be

---

[13] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[14] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

[15] Docket No. 59, at 48.

dismissed because Defendant's conduct "caused other elements of compensable harm in addition to, or other than, the death of James Redd."[16]

### A. THE DISCRETIONARY FUNCTION EXCEPTION

The FTCA provides a limited waiver of the federal government's sovereign immunity from private suits, but is itself subject to various exceptions contained in § 2680, including the "discretionary function" exception.[17] The discretionary function exception retains the United States' sovereign immunity and deprives federal courts of subject matter jurisdiction to hear

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.[18]

In *Berkovitz by Berkovitz v. United States*,[19] the Supreme Court provided a two-pronged test to help guide courts in determining whether the discretionary function exception applies to the challenged conduct. First, courts must decide if the challenged conduct is discretionary in nature involving an element of judgment or choice.[20] Second, courts must determine if the conduct was based on considerations of public policy.[21]

---

[16] *Id.* at 49.

[17] *Elder v. United States*, 312 F.3d 1172, 1176 (10th Cir. 2002).

[18] 28 U.S.C. § 2680(a).

[19] 486 U.S. 531 (1988).

[20] *Id.* at 536.

[21] *Id.* at 537.

Under the first prong of the *Berkovitz* test, the Court looks to whether the challenged conduct involves an element of judgment or choice.[22] "If a federal statute, regulation or policy imposes specific, mandatory directives, conduct pursuant to those directives is not discretionary since 'the employee has no rightful option but to adhere to the directive.'"[23] Plaintiffs have the burden of identifying a specific mandatory statute or regulation that precludes discretion for the conduct alleged to be actionable.[24]

Here, Plaintiffs have not met their burden in identifying a specific mandatory statute or regulation to which Defendant must adhere. Rather, Defendant cites to an FBI arrest policy effective in June 2009, which granted substantial discretion as to the number of officers the agency may use in an operation. The policy provided that an arrest team should "consist of enough agents/officers, whenever possible to cope properly with . . . other situations which might arise."[25] Additionally, "[b]ased on the exigency of the situation, the Special Agent in Charge (SAC) may authorize joint arrests with state and local authorities, U.S. Marshals, or other Federal law enforcement agencies."[26] Thus, rather than describe a course of action an employee must follow, the policy granted wide discretion to the FBI and BLM in the planning and

---

[22] *Id*. at 536.

[23] *Aragon v. United States*, 146 F.3d 819, 823 (1998) (quoting *Berkovitz*, 486 U.S. at 536).

[24] *See id*. ("The discretionary function exception poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction.") (internal quotation marks omitted)).

[25] Docket No. 63 Ex. 18, at Bates number FBI000036.

[26] *Id*. at Bates number FBI000043.

execution of the Redd warrants. Since Defendant's conduct involves a matter of choice or judgment, the action is discretionary and the Court considers the second prong.[27]

Under the second prong of the *Berkovitz* test, the Court must next determine whether "the exercise of judgment or choice at issue is of the kind that the discretionary function exception was designed to shield."[28] The purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."[29] Therefore, "[o]nly governmental actions and decisions based on considerations of public policy are protected by the exception."[30] "The pertinent inquiry is whether the decision implicates the exercise of a policy judgment of a social, economic, or political nature."[31] Moreover, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion."[32]

The Archaeological Resources Protection Act ("ARPA") passed by Congress in 1979, tasked federal personnel with the securing, "for the present and future benefit of the American people, the protection of archaeological resources" and the prevention of "the loss and destruction of these archaeological resources . . . resulting from uncontrolled excavations and

---

[27] *Aragon*, 146 F.3d at 823.

[28] *Id*. (internal quotation marks and citation omitted).

[29] *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984).

[30] *Aragon*, 146 F.3d at 823 (internal quotation marks and citation omitted).

[31] *Elder*, 312 F.3d at 1181 (internal quotation marks and citation omitted).

[32] *United States v. Gaubert*, 499 U.S. 315, 324 (1991).

pillage."[33] To that end, the execution of the Redd warrants under Operation Cerberus involved decisions grounded in various policy and social interests in accomplishing the stated purpose of ARPA.

Operation Cerberus was a highly coordinated, joint-bureau operation that reflected the complicated nature of the case. Federal personnel were divided into teams assigned to specific locations.[34] Search teams included both federal agents and unarmed civilian cultural specialists from the BLM, who helped the agents identify, catalog, and safeguard artifacts.[35] "As teams completed their assigned duties, they were reassigned to help with searches/arrests/transport where needed."[36] The Redd warrants were just one part of the 12 search and 19 arrests warrants simultaneously executed on that day. From the Redd residence, over 800 artifacts of significant cultural importance to the scientific, academic, and Native American communities were inventoried and ultimately seized.[37]

In conducting Operation Cerberus, and specifically in the execution of the Redd warrants, Defendant was required to balance federal policy and social interests, such as the allocation of federal resources, the safety of federal personnel, and the efficiency and expeditious retrieval of hundreds of fragile Native American artifacts. In other words, Defendant was required to make policy judgments in carrying out the stated purpose of ARPA—to protect and preserve

---

[33] 16 U.S.C. § 470aa.

[34] Docket No. 63 Ex. 2; Ex. 4; Ex. 5.

[35] Docket No. 53 Ex. 10, at 3.

[36] Docket No. 63 Ex. 7, at Bates number FBI000035.

[37] Docket No. 53 Ex. 22.

9

America's archaeological resources. Thus, Defendant's decisions were rooted in the kind of policy considerations the discretionary function exception was designed to shield.

Accordingly, the Court finds that Defendant's conduct in executing the Redd warrants falls under the discretionary function exception of the FTCA.

### B.   THE CONSTITUTIONALITY OF DEFENDANT'S CONDUCT

Plaintiffs argue Defendant's conduct violated Dr. Redd's constitutional rights and was therefore, nondiscretionary. A claim of excessive force under the Fourth Amendment requires an examination of "the reasonableness of the manner in which a search or seizure is conducted."[38] A court must scrutinize "whether the totality of the circumstances justified a particular sort of search or seizure."[39] In *Holland ex rel. Overdorff v. Harrington*,[40] the Tenth Circuit reviewed a decision to send a SWAT team to execute a warrant by "'balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'"[41]

In its previous Rule 12 Order, the Court allowed Plaintiff's IIED and wrongful death claims to survive based on the allegations that Defendant's agents used excessive force against Dr. Redd. This was largely based on the allegation that Defendant's agents dispatched 100 plus heavily armed officers to execute the Redd warrants.[42] The Court found that the lack of indicia of danger—that Dr. Redd was not accused of a violent crime, was not known to be dangerous or

---

[38] *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985).

[39] *Id.* at 8–9.

[40] 268 F.3d 1179 (10th Cir. 2001).

[41] *Id.* at 1188 (quoting *Garner,* 471 U.S. at 8).

[42] Docket No. 25, at 22.

living with dangerous people, and that nothing suggested the evidence would be destroyed unless a large force was dispatched—made the decision to allegedly deploy 100 plus heavily armed officers to the Redd residence arguably unreasonable, and therefore nondiscretionary.[43]

The competent record before the Court now calls into question those allegations. The actual evidence shows that an initial team of 12 armed federal agents and one unarmed cultural specialist were first deployed to execute the Redd warrants.[44] This team was followed by the arrival of an additional nine federal personnel to either assist with the search or observe in a supervisory capacity.[45] Though federal personnel continued to arrive and depart the Redd residence throughout the day until the conclusion of the operation at approximately 5:30 p.m., Dr. Redd's Fourth Amendment right to be free from the use of excessive force was not affected by the presence of these additional agents after he was transported from the residence.[46] Thus, Plaintiffs' claims rooted in excessive force can only relate to Defendant's conduct within the timeframe between 6:55 a.m., when Dr. Redd was arrested, until 10:34 a.m., when he was

---

[43] *Id.* at 16.

[44] Docket No. 63 Ex. 40, at 1.

[45] *Id.* Ex. 41.

[46] *See Estate of Redd v. Love*, No. 2:11-CV-478 RJS, Docket No. 120, at 15–17 (D. Utah December 11, 2015). *See also Brown v. United States*, 411 U.S. 223, 230 (1973) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."); *Porro v. Barnes,* 624 F.3d 1322, 1325 (10th Cir. 2010) ("[T]he Fourth Amendment protects against unreasonable searches and seizers and pertains to the events leading up to and including an arrest of a citizen previously at liberty.") (internal quotation marks omitted); *See e.g., Coleman-Johnson v. Chi., Ill. Police Officers*, No. 95 C 3455, 1996 WL 417568, at *4 (N.D. Ill. July 22, 1996) (holding that two § 1983 plaintiffs could not move forward on their excessive force claims, because the two plaintiffs were not present when the officers executed the allegedly unconstitutional search of a home).

transported to Monticello. Accordingly, the Court need not consider the events that occurred after Dr. Redd was transported to Monticello.

Plaintiffs dispute the number of armed agents dispatched to the Redd residence on the morning of the raid and the manner of dress and equipment used. Though Plaintiffs admit that "there are arguably fewer agents on Rule 56 than there were previously on Rule 12(b)(6),"[47] they maintain that there were "no less than 50 . . . and as many as 100" agents at the Redd residence on the day of the raid.[48] Plaintiffs argue that summary judgment should not be granted because Defendant's conduct amounted to an unconstitutional showing of force.

Plaintiffs rely in part on the declaration of Ms. Redd, who stated that she observed "as many as 50 agents at any one time" before 12:00 p.m.[49] Plaintiffs also rely on Senator Hatch's reference to unspecified media reports that "over 100 Federal agents were used in [the] operation" during a U.S. Senate Judiciary Committee oversight hearing.[50] Plaintiffs seem to suggest that because Attorney General Eric Holder did not deny Senator Hatch's recital of the media report, that his lack of denial serves as evidence that there may have been as many as 100 agents at the Redd residence.[51]

Plaintiffs additionally challenge the integrity of the sign-in log because one of the federal agents who was present at 6:40 a.m. did not sign into the log until 9:52 a.m. Plaintiffs allege that this agent participated in the interview of Dr. Redd, which took place in the garage rather than

---

[47] Docket No. 59, at 56.

[48] *Id*. at 52.

[49] Docket No. 60-1, at 6.

[50] Docket No. 59, at 40.

[51] *Id*. at 41–42.

inside the residence. Plaintiffs urge the Court to infer from the agent's late sign-in that all federal agents did not sign into the log until they entered the residence, which in turn suggests the presence of more agents at the residence than recorded.[52]

Lastly, using former United States Attorney Brett Tolman's statement in an FBI press release that the operation included "approximately 150 agents and employees from the FBI and BLM," Plaintiffs cross-referenced the "Operations Plan" and found that only 123 officers were accounted for.[53] Plaintiffs argue that the "remaining 27 agents were also present at the Redd home between (shortly after) 6:40 a.m. and before 10:34 a.m." without providing any factual support.[54]

Under Rule 56, once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must "present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor."[55] Here, Plaintiffs fail to present sufficient evidence demonstrating a genuine dispute of the record. The sign in log, which FBI and BLM agents were required to sign in and out of according to standard operating procedure, indicates that a total of 22 agents had been to the house by the time Dr. Redd departed, a total of 38 agents were present by noon, and a total of 53 agents had been to the residence by the end of the day.[56] Ms. Redd's vague statements that "there were more agents than [she] can count" and that "there appeared to be as many as 50 agents at any one time" does

---

[52] *Id*. at 46–47.

[53] *Id*. at 14–16.

[54] *Id*. at 16.

[55] *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

[56] Docket No. 53 Ex. 10, at 5; Docket No. 63 Ex. 39.

not controvert the competent record evidence before the Court. Ms. Redd has no personal knowledge of the sign in procedures and offers no factual support for her contentions.[57] Instead, Plaintiffs rely on wide speculation and leaps in logic. That one agent signed into the log late cannot reasonably lead to the inference that all federal agents did not sign into the log until they entered the residence; and that, therefore, there were more agents at the residence than those represented in the log. Further, Plaintiffs simply present no evidence to support the allegation that an additional 27 agents were present at the Redd residence between 6:40 a.m. and 10:34 a.m. Plaintiffs' calculations using unspecified media reports and press releases lack credibility and are based on conjecture and speculation.

In regards to the agents' dress, Ms. Redd's description of the initial team of agents as "heavily armed" and "appeared to be wearing bullet-proof vests or some sort of body armor or flak jacket" is consistent with the record. According to FBI policy, the "wearing of body armor by SA personnel is mandatory during planned arrests [and] execution of search warrants."[58] BLM policy also indicates that law enforcement officers of the BLM "who are engaged in duties that may expose them to high risk enforcement incidents such as search warrants, arrest warrants or felony vehicle stops, must wear soft body armor."[59]

---

[57] *See Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) ("[N]onmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient."); *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) ("In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.").

[58] Docket No. 63 Ex. 17.

[59] *Id.* Ex 13.

Thus, viewing the evidence in a light most favorable to Plaintiffs, the competent record evidence suggests that an initial team of 12 heavily armed agents, dressed in body armor first executed the search and arrest warrants on Dr. Redd and Mrs. Redd.  By the time Dr. Redd was transported to Monticello at 10:34 a.m., an additional nine federal agents were called in to assist the search or observe in a supervisory manner.  Together, these 22 federal agents did not amount to an unconstitutional showing of force.

Importantly, the Court will note that even if there were as many as 50 agents present at the Redd residence before noon as Ms. Redd suggests, this amount does not constitute an unconstitutional showing of force in this case.  The presence of over 800 artifacts required the assistance of additional agents to help catalog and inventory the items.  Therefore, it was not unreasonable to have as many as 50 agents engaged in conducting the search on Dr. Redd's residence.

In summary, Defendant's conduct in executing the Redd warrants was reasonable under the totality of the circumstances.  Defendant's use of 12 heavily armed agents, dressed in body armor reflected in part its concern for the safety of federal personnel in executing the Redd warrants.  This concern was justified as evidenced by the two threatening voice messages left at the Redd residence later that afternoon.  Moreover, Defendant's use of additional federal personnel to assist with the search was warranted as over 800 artifacts were ultimately identified by the end of the day.  Thus, the Court finds that Defendant's conduct in executing the Redd warrants was reasonable and did not amount to an unconstitutional showing of force.  Therefore, the Court will grant Defendant's Motion for Summary Judgment and dismiss this case under the discretionary function exception of the FTCA.

Finally, the Court notes that Plaintiffs mistakenly asserted a "survival action" under Utah Code Annotated § 78B-3-107 in its Complaint. Utah's survival statute does not create a separate cause of action, but rather serves to ensure that an existing cause of action does not abate when an injured person dies.[60] Therefore, only Plaintiff's IIED and wrongful death claims survived the Court's Rule 12 Order and are now dismissed in this Order.

## IV.  CONCLUSION

It is therefore

ORDERED that Defendant's Motion for Summary Judgment (Docket No. 53) is GRANTED. The Clerk of the Court is directed to close this case forthwith.

DATED this 15th day of March, 2016.

BY THE COURT:

Ted Stewart
United States District Judge

---

[60] *See Berrett v. Albertsons Inc.*, 293 P.3d 1108, 1120 (Utah Ct. App. 2012) ("By their nature, survival statutes do not give rise to new causes of action; rather, they regulate the viability and scope of preexisting causes of action."); Utah Code Ann. § 78B-3-107 ("A cause of action arising out of personal injury to a person, or death caused by the wrongful act or negligence of a wrongdoer, does not abate upon the death of the wrongdoer or the injured person.").